UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

United States of America,

                Plaintiff,                        Court File No. 18-cr-18 (2) (DWF/LIB)

    v.

                                            **REPORT AND RECOMMENDATION**

Amos Kiprop Koech,

                Defendant.

_____

      This matter is before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of 28 U.S.C. § 636 and Local Rule 72.1, and upon Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 50]; his Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 51]; and his Motion for Severance, [Docket No. 52]. The Court held a Motion Hearing on May 7, 2018, at which the parties requested the opportunity to submit supplemental briefing on the Motion. [Docket No. 65]. The supplemental briefing was completed on June 19, 2018, after which Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 50]; his Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 51]; and his Motion for Severance, [Docket No. 52], were taken under advisement.

      For the reasons set forth below, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 50], be **DENIED**; Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 51], be **DENIED**; and Defendant's Motion for Severance, [Docket No. 52], be **DENIED**.

## I.    RELEVANT FACTS

Defendant Amos Kiprop Koech ("Defendant") has been criminally charged with one count of conspiracy to commit sex trafficking of a minor and one count of sex trafficking of a minor. (Indictment, [Docket Nos. 1 and 19]). The Motion to Suppress Statements, Admissions, and Answers, [Docket No. 50], and the Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 51], pertain to events that took place during law enforcement's investigation of the crimes with which Defendant has been charged. Because resolution of the present Motions requires a detailed consideration of the facts related to each encounter between Defendant and law enforcement and the facts related to each search warrant now challenged, a general overview of the underlying facts is provided at the outset of this Report and Recommendation, and additional facts are recited as needed in the analysis section below.

On July 7, 2017, Duluth Police were asked to assist a probation officer with a check of a GPS unit being used by an individual, Andreia Latrice Brown, who was on probation. ([Docket No. 62-10], 2; see, also, Govt. Exh. 14, C_D-file2(2).mp4, 00:00-2:21[1]). Ms. Brown was present in her apartment when the officers arrived, and she let them into the apartment; also present in the apartment was Andre Mathis, who is also a Defendant in this case. (Id. at 2:00-21, 2:30-47; 4:06-55). While in Ms. Brown's apartment, the police officers discovered a young woman in a closet; ultimately, the young woman was discovered to be a runaway, and she left with the police officers. (Id. at 3:30-40, 32:33-39:18).

Duluth Police Officer Pemrick interviewed the minor, "CLD," at Duluth Police Headquarters, and she stated that Defendant Mathis had arranged for her to have sex with

---

[1] The name of the audio/video recording cited here, as labeled by the Government in its Exhibit 14, includes the full name of one of the minors, elsewhere referred to as CLD, who is an alleged victim of the crimes charges in this case. Rather than include the victim's name in this publically filed Report and Recommendation, the Undersigned will refer to this video file as "C-D-file 2(2) mp4".

individuals, including a man named "Amos" on four separate occasions, in exchange for money that Mathis kept. (Govt. Exh. 10, [Docket No. 62-10], 2). CLD further told Officer Pemrick that "Amos" took pictures of her with his phone. (Id.). CLD described the apartment of the man named "Amos" and Officer Pemrick, who was familiar with Defendant Koech through his patrols through Defendant Koech's neighborhood, believed that the man CLD referred to as "Amos" was Defendant Koech. (Id.).

Accordingly, on July 15, 2017, Officer Pemrick went to speak to Defendant Koech. (See, Govt. Exh. 13, Amos_Koech-file 5.mp4; Govt. Exh. 14, Amos_Koech-file 6.mp4). That encounter is discussed in detail below. Based upon statements made by Defendant Koech during that encounter, Lieutenant Robert Shene of the Duluth Police Department instructed Officer Pemrick to return to Defendant Koech's home and secure his cell phone while Lieutenant Shene obtained a warrant to seize the phone and Defendant Koech's DNA. (Govt. Exh. 10, [Docket No. 62-10], 2-3). Officer Pemrick returned to Defendant Koech's home, and he waited there with Defendant Koech—and after a while, a second Duluth Police Officer, Officer Goss—for approximately 90 minutes, until Lieutenant Shene arrived with the signed warrant. (See, Govt. Exh. 13, Amos_Koech-file 3.mp4; Govt. Exh. 13, Amos_Koech-file 4.mp4; Govt. Exh. 14, Amos_Koech-file 7.mp4). Prior to the arrival of Lieutenant Shene but after receiving notification that the warrant had been signed by a judge, Officer Pemrick seized Defendant Koech's cell phone and secured a sample of his DNA. (Govt. Exh. 13, Amos_Koech-file 4.mp4, 1:09:56- 1:12:09). Later that same day, Defendant Koech brought Duluth police officers into his apartment and showed them clothing and a bag that he alleged Defendant Mathis had left in his apartment; the bag contained a CO2 gun that Duluth Police took away at Defendant Koech's request. (Govt. Exh. 13, Amos_Koech-file 2.mp4; Govt. Exh. 14, Amos_Koech-file 8.mp4).

On July 31, 2017, Duluth Police Investigator Christopher Martin applied for and obtained a warrant to search the contents of the cell phone seized from Defendant Koech on July 15, 2017. (Govt.'s Exh. 10, [Docket No. 62-10]). On August 2, 2017, Investigator Martin twice spoke with Defendant Koech at his workplace and obtained the password for that cell phone. (Transcript, [Docket No. 71], 4-5; Govt. Exh. 13, AXON_BODY_2_Video_2017-08-02).

When Investigator Martin searched the contents of Defendant Koech's phone, he discovered photographs of a topless female, which were confirmed to be photographs of CLD. (Govt. Exh. 12, [Docket No. 62-12], 4). He also discovered conversations between Defendant Koech and other females, who appeared to be minors, which he believed were in regards to purchasing sex. (Id.). Accordingly, on September 7, 2017, Investigator Martin applied for and obtained a warrant to search Defendant Koech's home for digital devices and storage media, among other things. (Id. at 1-9).

On September 11, 2017, Investigator Martin and Agent Heidenreich of the FBI went to Defendant Koech's home and questioned him about the events involving Defendant Koech, Defendant Mathis, and minor females. (Govt. Exh. 13, AXON_Body_2_Video_2017-09-11_1006.mp4). Agent Heidenreich and Investigator Martin spoke with Defendant Koech in his home for approximately 90 minutes, after which Duluth Police executed the search warrant. (Id.).

On March 7, 2018, Defendant Koech was arrested and federally charged. (Govt. Exh. 14, AXON_BODY_2_Video_2018-03-07). That day, shortly after his arrest, Defendant Koech waived his Miranda rights and he was again questioned by Investigator Martin and Agent Heidenreich. (Id.).

Defendant Koech's present Motion to Suppress Statements, Admissions, and Answers, [Docket No. 50], and his Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 51], challenge the searches and statements referenced above.

## II.    DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS, [Docket No. 50]

Defendant Koech seeks suppression of statements he made to law enforcement on July 15, 2017; August 2, 2017; September 11, 2017; and March 7, 2018.[2] (Mem. in Supp., [Docket No. 75]). He argues that each of these encounters was involuntary and custodial, and that his statements were made without the required advisory and waiver of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). (Id. at 11-14). Accordingly, Defendant Koech contends that any statements he made during these encounters must be suppressed.

The Government responds that the statements Defendant Koech now challenges were freely and voluntarily given and that the statements on July 15, 2017; August 2, 2017; and September 11, 2017; did not occur during a custodial interrogation, so no Miranda warnings were required. (Mem. in Opp., [Docket No. 76], 8).

### A.  Standards of Review

"The Fifth Amendment requires that Miranda warnings be given when a person is interrogated by law enforcement after being taken into custody." United States v. Giboney, 863 F.3d 1022, 1027 (8th Cir. 2017).

---

[2] The initial reference in Defendant Koech's Memorandum in Support is to a statement on "3/10/18." (Mem. in Supp., [Docket No. 75], 10). However, there are no other references to a March 10, 2018, statement within his Memorandum in Support of the present Motion, and neither the Exhibits submitted by the Government nor the Government's Memorandum in Opposition to the present Motion refer to any statement by Defendant Koech on March 10, 2018. Defendant Koech does, however, refer briefly to statements he made during an interview on March 7, 2018, and the Government argues the constitutional compliance of an interview on March 7, 2018. (Mem. in Supp., [Docket No. 75], 11; Mem. in Opp., [Docket No. 76], 14-15). Therefore, the Undersigned presumes that Defendant Koech's initial reference to a statement on "3/10/18" was a scrivener's error by counsel and was intended to refer to the statements made on March 7, 2018.

"The ultimate question in determining whether a person is in 'custody' for purposes of <u>Miranda</u> is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." This determination is not based on the interrogator's perspective; 'the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.'

Six factors inform our analysis, although the factors are not exhaustive and need not be applied "ritualistically" in every case. The first three factors, which if present tend to show that [an individual] was not in custody, are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; [and] (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions.

The remaining factors, if present, favor a finding that [an individual] was in custody during the interrogation. Those factors are: "(4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; [and] (6) whether the suspect was placed under arrest at the termination of the questioning."

<u>Id.</u> (citations omitted). "To determine whether a suspect was in custody, we ask 'whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave or cause the agents to leave.'" <u>U.S. v. Laurita</u>, 821 F.3d 1020, 1024 (8th Cir. 2016). If an interview is not custodial, law enforcement is not required to advise an individual of his <u>Miranda</u> rights and statements made during a non-custodial encounter need not be suppressed for the lack of <u>Miranda</u> warnings. <u>Giboney</u>, 863 F.3d at 1029.

In addition, "'[a] statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.'" <u>U.S. v. Mshihiri</u>, 816 F.3d 997, 1004 (8th Cir. 2016) (citation omitted). "'[C]oercive police activity is a necessary predicate to the finding that a [statement] is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.'"

U.S. v. Thunderhawk, 799 F.3d 1203, 1206 (8th Cir. 2015) (citation omitted). As with the question of whether an encounter is custodial in nature, the question of whether a statement is voluntary under the Fourteenth Amendment is one that is answered considering the totality of the circumstances. U.S. v. Adams, 820 F.3d 317, 323 (2016).

### B. Analysis

Defendant Koech's arguments in support of this Motion are largely generalized arguments apparently meant to apply to all of the statements he made to law enforcement. For example, Defendant Koech gives very brief descriptions of the circumstances of each statement he now challenges, and then he asserts:

> Each of these questioning sessions was involuntary and conducted in an environment where Mr. Koech was not free to leave, thus rendering the questioning "custodial[,"] bringing the protections of Miranda into play. It is undisputed that Miranda warning and waiver of those rights did not precede the questioning in each of these instances. Therefore, all statements should be suppressed.

(Mem. in Supp., [Docket No. 75], 11). Defendant Koech further argues generally that "the initial deprivation of [his] freedom turned into the functional equivalent of arrest when the officers talked to him on each occasion. Here, the scope of the police encounters turned into a coercive environment controlled by the police in which Mr. Koech's freedom was restrained." (Id. at 12). Defendant Koech notes again that he was not read his Miranda rights on the now-challenged occasions, and he argues broadly that "the statements were involuntary." (Id. at 12-13). Again without arguing specifics or citing to supporting evidence in the record now before the Court, Defendant Koech concludes: "[T]he statements were the result of prolonged police presence and pressure during each interrogation." (Id. at 14). To the very limited extent that specific arguments are made regarding any of the statements now challenged, they are addressed below with respect to the appropriate statement, as are the Government's arguments in response.

The undersigned has fully reviewed the audio-video recordings of each statement individually, considered the arguments by Defendant Koech and the Government with respect to each statement, and makes the following recommendations as to each statement below.

### i. The July 15, 2017, Statements

Defendant Koech moves to suppress statements he made to police on July 15, 2017. (Mem. in Supp., [Docket No. 75], 10). As set forth above, he argues generally that the statements were involuntary, compelled, and occurred during custodial interrogation that occurred without advisement or waiver of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). (Mem. in Supp., [Docket No. 75], 10). With respect to the statements made on July 15, 2017, specifically, Defendant Koech contends that "police badgered him while he was on the porch outside of his apartment building, at one point taking his cell phone from him, and discouraging him from leaving while they secured a warrant, the warrant for his DNA and cell phone." (Id.). The Government argues that none of the statements made on July 15, 2017, were made during a custodial encounter, and thus there was no need for Miranda warnings. (Mem. in Opp., [Docket No. 76], 8-9).

Defendant Koech had multiple interactions with police officers on July 15, 2017. Because he has not specified precisely which encounter he is challenging, the Court has reviewed all of the evidence before it that relates to any statement made by Defendant to police on July 15, 2017. The encounters that day were as follows.

### 1.    First July 15, 2017, Encounter

At approximately 2:35 p.m.[3] on July 15, 2017, Officer Pemrick of the Duluth Police Department[4] parked his patrol vehicle in an alley next to Defendant Koech's residence, where Defendant Koech was sitting on his front porch. Officer Pemrick greeted Defendant Koech by name and asked if Defendant Koech had time to talk to him; Defendant Koech replied that he did. (Govt. Exh. 14, Amos_Koech-file 6.mp4, 00:00-45[5]). When asked whether he preferred to talk outside or inside, Defendant Koech said he wanted to talk outside, so they remained outside—Defendant Koech remained seated in a chair on his porch, and Officer Pemrick stood off to the side of the house and talked to him over the porch railing. (Id. at 00:45-1:00).

Officer Pemrick questioned Defendant Koech about his interactions with Defendant Mathis and the alleged victim in the case, and Defendant Koech stated at one point that he had purchased a speaker from Defendant Mathis. (Id. at 1:00-4:58). Defendant Koech offered to go get the speaker to show Officer Pemrick, but Officer Pemrick said that was not necessary, stating, "I'm just here to talk to you." (Id. at 7:30-42). He then informed Defendant Koech that he was "not in trouble" and was "not going to jail or anything like that today," but that Officer Pemrick was there to "try and corroborate some of the things [other people] were telling [him]." (Id. at 7:42-51). A little less than 2 minutes later, Defendant Koech asked Officer Pemrick if he

---

[3] All approximate times in this Report and Recommendation are determined by the time stamp at the beginning of the relevant audio/video body camera footage submitted by the Government in conjunction with the Motions presently before the Court.

[4] Although the officer on this recording does not identify himself by name, a review of the other audio/video recordings submitted by the Government in conjunction with the Motions presently before the Court reveals the identity of the officer speaking to Defendant in this recording. (See, Govt. Exh. 13, Amos_Koech-file 5.mp4, 2:40-3:18 (officer identifying himself as Officer Pemrick) and 6:00-35 (officer reminding Defendant of part of their conversation earlier in the day, which is memorialized in Govt. Exh. 14, Amos-Koech-file 6 mp4, 16:50-14:39)).

[5] A majority of this encounter is also memorialized in an audio video recording from the body camera of the second officer present, which was submitted to the Court as Amos_Koech-file 5 mp4, located on Govt.'s Exhibit 13. Because the second officer did not arrive until after the encounter between Defendant and law enforcement had begun and because the windy nature of the day makes the sound quality of the second officer's recording less clear, the citations in this Report and Recommendation are made to the footage from the body camera of the officer who actually spoke with Defendant. However, the Undersigned once again notes that he has reviewed all of the audio/video recordings submitted in conjunction with the present Motion.

had "a minute" and when he said yes, Defendant Koech got up and went into the building. (Id. at 8:25-26). He returned approximately 30 seconds later with a small speaker that he handed to Officer Pemrick. (Id. at 8:58-9:00).

Shortly thereafter, Officer Pemrick asked how Defendant Koech and Defendant Mathis communicated, and Defendant Koech stated that they communicated mainly through text messages. (Id. at 9:10-34). Officer Pemrick asked Defendant Koech for the phone number he used to reach Defendant Mathis, and Defendant Koech got out a cell phone. He looked in the cell phone for a while, then he stated, "That's the last number I have," and handed his phone to Officer Pemrick to show him the phone number. (Id. at 9:34-11:14).

At approximately 12 minutes and 42 seconds into the audio/video recording, Officer Pemrick told Defendant Koech that certain minor girls whom they had been discussing had alleged that Defendant Koech took pictures of them with his cell phone, and Officer Pemrick asked whether his cell phone had a camera. (Id. at 12:42-13:03). Defendant Koech replied that his current phone did not have a camera on it. (Id. at 13:03-50). When Officer Pemrick asked if he could "take a look" at Defendant Koech's phone, Defendant Koech said no. (Id. at 13:50-14:00). Officer Pemrick asked, "Why not?" and Defendant Koech said that he "would need a lawyer for that." (Id. at 14:00-09). Officer Pemrick said that "we might have to go that route" if Defendant Koech did not cooperate in the investigation, and Defendant Koech stated, "I will talk to you in the presence of my lawyer." (Id. at 14:09-26). Officer Pemrick asked if Defendant Koech would "be around" the rest of the day and whether he would be home if Officer Pemrick stopped by again later that day. Defendant Koech nodded and said, "I'll be home." (Id. at 14:26-39). Officer Pemrick said, "Well, it was nice talking to you," and Defendant Koech replied, "Nice talking to you, too." (Id. at 14:39-42). Officer Pemrick then left. (Id.).

The audio/video recording provided by the Government clearly indicates that this encounter between Officer Pemrick and Defendant Koech was not custodial in nature. Defendant Koech voluntarily acquiesced to Officer Pemrick's request to answer questions, and the conversation took place in Defendant Koech's preferred location. He was free to move about during the encounter; in fact, he went into his home unaccompanied at one point with no objection by Officer Pemrick. Officer Pemrick used no "strong arm tactics or deceptive stratagems" during the questioning. The atmosphere was casual and good-natured, not intimidating. Although two officers were present at the scene, only Officer Pemrick interacted with Defendant Koech. He explicitly informed Defendant Koech that he was not in trouble, he was not going to be arrested that day, and that he was simply there to talk. Finally, when Defendant Koech indicated that he did not want to talk to Officer Pemrick any further, Officer Pemrick concluded the questioning and left. The entire encounter was less than 15 minutes long.

Considering the totality of the circumstances, nothing occurred during the encounter that would have caused a reasonable man in Defendant Koech's position to believe that he was not at liberty to terminate the encounter and either leave or cause Officer Pemrick to leave. See, Laurita, 821 F.3d 1020, 1024 (8th Cir. 2016). Accordingly, Defendant Koech was not in custody during this encounter, so police were not required to advise him of his Miranda rights. See, Giboney, 863 F.3d at 1029 (holding that statements made during a non-custodial encounter need not be suppressed for the lack of Miranda warnings);

Moreover, the audio/video recording of the encounter revealed no coercive behavior by law enforcement, much less behavior that was so coercive as to overcome Defendant Koech's will or critically impair his capacity for self-determination. Therefore, Defendant Koech's arguments that his statements made during this encounter were involuntary are similarly

unavailing. See, Thunderhawk, 799 F.3d at 1206 (holding that coercive police conduct is a necessary prerequisite to finding statements involuntary).

### 2.  Remaining July 15, 2017, Encounters

The remaining encounters between Defendant Koech and law enforcement on July 15, 2017, appear to have occurred nearly continuously. Because of the continuing nature of the interactions, the remaining events of the afternoon and evening of July 15, 2017, will be considered as a whole.

At approximately 3:53 p.m. on July 15, 2017, Officer Pemrick returned to Defendant Koech's home, where Defendant was again sitting in a chair on his front porch, talking on his cell phone. (Govt. Exh. 13, Amos_Koech-file 4.mp4, 00:00-37). Officer Pemrick told Defendant Koech that he could finish his phone call and then they would talk. (Id. at 00:45-55). When Defendant Koech finished his phone call and hung up, Officer Pemrick explained that his lieutenant was at the police station getting a warrant to take Defendant Koech's cell phone and his DNA. (Id. at 1:20-36). Officer Pemrick then stated, "I need to take your phone," but when he reached for the phone, Defendant Koech leaned away and said, "Nah." (Id. at 1:20-40). Officer Pemrick again informed Defendant Koech that the police were working to obtain a search warrant for his cell phone, and he said, "I'm going to take your phone to ensure that nothing happens to the evidence on the phone." (Id. at 1:36-55). Officer Pemrick stated that Defendant Koech could either hand the phone over or they could wait until Officer Pemrick's partner arrived, at which point Defendant Koech would be handcuffed and they would take the phone from him anyway. (Id. at 1:55-2:06). At that point, Defendant Koech handed Officer Pemrick the cell phone. (Id. at 2:06-11).

Officer Pemrick then stated that he was going to sit with Defendant Koech until the search warrant was signed, but that if the search warrant was <u>not</u> signed, he would give Defendant Koech back his phone and go on his way. (<u>Id.</u> at 2:11-40). Officer Pemrick asked whether Defendant Koech had any questions at that point, and he asked for Officer Pemrick's name, which was provided. (<u>Id.</u> at 2:40-3:18).

Officer Pemrick then made a phone call to let his partner know that he had the phone and that everything was going smoothly. (2:40-5:23). During this phone call, Defendant Koech asked if he had the right to a lawyer, but Officer Pemrick did not respond. (<u>Id.</u> at 4:22-26). When Officer Pemrick finished his phone call, Defendant Koech asked, "What's the verdict?" Officer Pemrick again explained that he would wait with Defendant Koech while his lieutenant drafted the search warrant, which would then be shown to a judge. If the judge signed it, police would take the phone and Defendant Koech's DNA and, if the judge did not sign it, Defendant Koech would get his phone back. (<u>Id.</u> at 5:23-6:13). Defendant Koech responded, "All right. That's cool." (<u>Id.</u> at 7:10-15). Officer Pemrick stated, "We appreciate you cooperating," and Defendant Koech responded, "I cooperate with law enforcement. They are the people who protect us." (<u>Id.</u> at 7:18-37).

Officer Pemrick and Defendant Koech talked for a few minutes about various subjects unrelated to the investigation and, at approximately 9 and a half minutes into the audio/video recording, another patrol vehicle drove by. (<u>Id.</u> at 7:37-9:40). In response to an inaudible question from the driver of that vehicle, Officer Pemrick stated, "Absolutely. We're just hanging out." (<u>Id.</u> at 9:40-49). Officer Pemrick and Defendant Koech continued to talk, discussing international politics, and Officer Pemrick again explained the process that was occurring elsewhere to obtain a warrant for Defendant Koech's cell phone and his DNA. (<u>Id.</u> at 9:49-

13:05). Their conversation continued; they talked about Defendant Koech's daughter, and Defendant Koech spoke with friends who walk by the house, laughing and joking with them. (Id. at 13:05-17:45). While Officer Pemrick and Defendant Koech were talking about the root of society's problems, a second Duluth Police officer, Officer Goss, walked up and joined them. (Id. at 17:45-18:46). Defendant Koech and the two Officers continued to talk about various subjects, including sports, politics, the neighborhood, and police officers. (Id. at 18:46-30:37).

At approximately 33 minutes into the encounter, Defendant Koech picked up his cell phone, and Officer Pemrick stated that he could make phone calls, but he should not delete anything on the cell phone. (Id. at 33:37-50). Defendant Koech explained that he was looking for a picture of his daughter to show Officer Pemrick, and he showed Officer Pemrick a picture that was on the cell phone. (Id. at 33:50-34:10). Afterward, Defendant Koech kept possession of his cell phone, and he continued speaking with Officers Pemrick and Goss about other matters unrelated to the investigation, including parenting, learning styles, and international politics. (Id. at 34:10-54:56). Officer Pemrick took a telephone call at approximately 55 minutes into the encounter, during which he said, "He's all right. We're just talking about life. . . . We're avoiding the obvious subject but we're having some good conversations here, learning a lot about each other." (Id. at 54:56-55:35).

Officer Pemrick concluded his telephone call and informed Defendant Koech that the search warrant had been submitted to a judge but that it would be approximately 15 more minutes before they discovered whether the warrant had been signed. (Id. at 56:25-43). Approximately 3 minutes later, Defendant Koech asked to go upstairs to use his bathroom. Officer Pemrick asked if he could wait, but when Defendant Koech answered in the negative, Officer Pemrick told him to leave his cell phone on the porch railing, and Officer Pemrick

accompanied him upstairs so that he could use the bathroom, after which they returned to the porch. (Id. at 59:10-1:01:14). Defendant Koech and the Officers continued talking about cars and other innocuous subjects until Officer Pemrick received a phone call informing him that the warrant had been signed. (Id. at 1:01:14-1:07:18).

At that point, Officer Pemrick took the phone, placed it into airplane mode, and turned it off; he also explained that the lieutenant was on his way to Defendant Koech's home with a property receipt and a copy of the warrant. (Id. at 1:07:40-1:08:08). Officer Pemrick further told Defendant Koech that forensic examiners would go through his cell phone later, and that once Officer Goss took a DNA sample and Defendant Koech received his property receipt and copy of the warrant, the Officers would leave. (Id. at 1:08:08-1:08:55). Defendant Koech asked whether it would be appropriate to have a lawyer present for the DNA collection, and Officer Pemrick replied that he did not have the option to refuse to cooperate with the warrant. (Id. at 1:08:55-1:09:56). Officer Pemrick further stated, "[T]he lawyer part, would be if you're going to jail, which you're not. You're not under arrest. You're not being questioned. You're not being read your Miranda warning, so it really doesn't apply in this situation." (Id.). Defendant Koech replied, "Ok. All right. I understand." (Id. at 1:09:54-1:09:56).

Officer Pemrick took Defendant Koech's cell phone and secured it in his patrol vehicle, while Officer Goss explained the buccal swab process and watched as Defendant Koech used the swabs to provide a DNA sample. (Id. at 1:09:56-1:11:43). Officer Pemrick retrieved the swabs from Officer Goss and then informed Defendant Koech that he could go up to his apartment if he wanted to, but the Officers were going to stay and wait for the lieutenant to bring the paperwork. (Id. at 1:11:43-1:12:09). Officer Pemrick asked Defendant Koech if he had any questions at that point, and Defendant Koech asked Officer Pemrick where he would go on vacation if he could

go anywhere in the world. (Id. at 1:12:09-1:12:27). Defendant Koech remained on the porch, talking with the officers and with another individual who lived in the neighborhood and had walked up and joined the conversation. (Id. at 1:12:27-1:25:00). Eventually, a Duluth Police Sergeant arrived, Officer Pemrick told Defendant Koech that the lieutenant should be there soon, and Officer Pemrick returned to his patrol vehicle. (Id.at 1:24:00-1:26:04).

At approximately 5:20 p.m. Officer Pemrick returned to Defendant Koech's porch, where Defendant Koech remained seated. (Govt. Exh. 13, Amos_Koech-file 3.mp4, 00:00-34[6]). A Duluth Police Department Lieutenant and a second Duluth Police Officer walked up to the porch, and the Lieutenant explained to Defendant Koech that there would probably be a forensic examination of his cell phone, which would include looking at text messages, pictures, and everything else on the phone, and they would submit Defendant's DNA to the BCA lab. (Id. at 1:03-34). Officer Pemrick completed a property receipt for Defendant Koech's cell phone, and gave a copy of it to Defendant Koech. (Id. at 2:33-4:44, 6:45-7:26). The other Officer present also reminded Defendant Koech that, as the lieutenant had apparently told him earlier,[7] "You're not under arrest, you're not going to jail right now." (Id. at 4:40-44).

At approximately 5:32 p.m., as Defendant Koech was sitting on his porch, looking at what appears to be the copy of the warrant and property receipt he received that day, he stated to an officer standing near the porch, "I'm going to show you something." (Govt. Exh. 13, Amos_Koech-file 2.mp4, 00:00-1:27). Defendant Koech told the Officer that Defendant Mathis had left some clothing and a backpack at his home, as well as another item, which Defendant

---

[6] This encounter was also partially recorded by another officer's body camera, which footage was submitted as Government's Exhibit 14, Amos_Koech-file 7.mp4. Because the additional footage merely corroborates a portion of the encounter as recorded and submitted in Government's Exhibit 13, Amos_Koech-file 3.mp4, it is not cited to herein. However, the Undersigned notes once again that he reviewed all of the evidence submitted to the Court in conjunction with the Motions presently before it.

[7] This statement was not included in the Government's audio/video footage.

Koech described as "scary." (Id. at 1:25-2:02). The three police officers who were present walked to the porch, and the officer wearing the body camera that recorded the events stated, "You want to show us something?" (Id. at 2:02-22). Defendant Koech walked into the building and up the stairs to his apartment, and the officers followed. (Govt. Exh. 14, Amos_Koech-file 8.mp4, 00:00-44).

Once inside the apartment, the officers and Defendant Koech went into the living room, where Defendant Koech identified a pile of clothing within a closet as belonging to Defendant Mathis and he also identified a bag that he said Defendant Mathis left there and which he believes contains a weapon. (Id. at 00:44-1:57). One of the officers asked, "Do you mind if I go through this bag?" and Defendant responded, "Go ahead, go ahead." (Id. at 2:10-16). The officer searched the bag and discovered a CO2 gun. (Id. at 2:16-3:16). When the officer began to return the bag and the CO2 gun to the closet, Defendant Koech asked him to take it and the officer stated that he could "get rid of the gun if you want me to." Defendant Koech replied, "Yeah." (Id. at 5:10-25). The officer took the CO2 gun, and the officers and Defendant Koech left the apartment. (Id. at 5:10-6:15). On the way down the stairs, the officers thanked Defendant Koech. (Id. at 6:15-7:00). A second recording from a body camera worn by another of the officers present for these events also shows these events as related above. (Govt. Exh. 13, Amos_Koech-file 2.mp4, 2:22-6:36). This second recording shows even more clearly that the officers and Defendant Koech made jokes and laughed together while one of the officers examined the contents of the bag. (Id. at 6:36-8:00).

Contrary to Defendant Koech's arguments in support of his present Motion to Suppress Statements, the totality of the circumstances present during these encounters with law enforcement do not lead to the conclusion any of his statements therein were involuntary. The

audio/video recordings of the encounter show Defendant Koech laughing and joking with the Officers present, and it reflects absolutely no use of coercion or "strong arm" tactics by Officer Pemrick, Officer Goss, or any of the other law enforcement officers with whom Defendant Koech interacted on July 15, 2017. Thus, Defendant Koech's statements, such as they were, were voluntary.[8]

With respect to Defendant Koech's argument that his statements during these events should be suppressed because he was not advised of his <u>Miranda</u> rights, the Undersigned notes that "[t] Fifth Amendment requires suspects to be informed of their <u>Miranda</u> rights before any custodial <u>interrogation</u>." <u>See</u>, <u>U.S. v. Jones</u>, 842 F.3d 1077, 1082 (8th Cir. 2016) (emphasis added). Even assuming solely for the sake of argument that the events as related above were at some point custodial, nothing in the evidence now before the Court supports the conclusion that Defendant Koech was at any time on July 15, 2017, interrogated by law enforcement.

"Interrogation, for <u>Miranda</u> purposes, means 'express questioning' and 'words or conduct that officers should know [are] "reasonably likely to elicit an incriminating response from the suspect."'" <u>Jones</u>, 842 F.3d at 1082. As stated above, the Undersigned reviewed the entirety of the audio/video recording of Defendant Koech's interactions with law enforcement on the afternoon and evening of July 15, 2017, and at no time did Officer Pemrick, Officer Goss, or any other law enforcement officer involved engage in any activity, implicit or explicit, that was reasonably likely to elicit an incriminating response from Defendant Koech. Therefore, because no interrogation occurred, the officers were not required to inform Defendant Koech of his

---

[8] The Undersigned further notes that it is not clear what statements, precisely, Defendant is seeking to suppress from this encounter, as the vast majority of the statements made by Defendant during this second set of encounters on July 15, 2017—especially during the approximately 90-minute conversation with Officer Pemrick and, eventually, Officer Goss while awaiting the warrant—were completely innocuous, having no relevance to any events underlying the present case.

<u>Miranda</u> rights. <u>See</u>, <u>Jones</u>, 842 F.3d at 1083 (finding no error in district court admitting the defendant's un-<u>Mirandized</u> statements to police which were not the product of interrogation).

Accordingly, Defendant's arguments that any statements he made during this encounter were involuntary or that they must be suppressed because he was not advised of his <u>Miranda</u> rights are unavailing.

### ii. The August 2, 2017, Statements

At the May 7, 2018, Motion Hearing, Investigator Martin of the Duluth Police Department testified that he spoke with Defendant Koech twice on August 2, 2017. (Transcript, [Docket No. 71], 4-5). Investigator Martin further testified that the initial encounter was not recorded because he "forgot to put his body cam on" prior to the encounter. (<u>Id.</u> at 7). Therefore, the initial interaction on August 2, 2017, between Defendant Koech and law enforcement is before the Court only upon Investigator Martin's testimony as to the interaction.

After Defendant Koech's cell phone was seized on July 15, 2017, Investigator Martin applied for and, on July 31, 2017, he obtained a search warrant to conduct a forensic examination of the cell phone. (Transcript, [Docket No. 71], 1-3). However, when the forensic examiner attempted to examine the cell phone, he was unable to do so because the cell phone was password protected. (<u>Id.</u> at 4).

Accordingly, in the early afternoon of August 2, 2017, Investigator Martin went to the nursing home where Defendant Koech worked and found him near the human resources offices. (<u>Id.</u> at 5). Investigator Martin informed Defendant Koech that he had a valid search warrant for his cell phone, but they needed the password to access the phone's contents. (<u>Id.</u>). Investigator Martin further informed Defendant Koech that if he did not obtain the password, "we might have to break or destroy the phone to get the data off of the phone." (<u>Id.</u>). Investigator Martin asked

Defendant Koech if he was willing to give him the password, and Defendant Koech told Investigator Martin the password. (Id.). After receiving the password, Investigator Martin returned to the forensic lab. (Id. at 7).

Investigator Martin testified at the May 7, 2018, Motion Hearing that the entire initial encounter took "[n]o more than a couple of minutes," he did not draw a weapon, he did not threaten Defendant Koech, and he did not make any promises to him. (Id. at 6). Investigator Martin described Defendant as "pretty cooperative," and according to Investigator Martin, Defendant did not ask to speak with his attorney, nor did Defendant say he did not want to answer Investigator Martin questions. (Id. at 6-7).

Upon returning to the forensic lab, another police Investigator attempted to use the password given by Defendant Koech, but it did not work. (Id. at 7, 15-16). Thus, Investigator Martin returned to the nursing home to try again to obtain the correct password. (Id.at 8). This second August 2, 2017, encounter with Defendant Koech was recorded by Investigator Martin's body camera. (See, Exh. 13, AXON_BODY_2_Video_2017-08-02).

At the beginning of the audio/video recording, an unidentified female told Investigator Martin and Defendant Koech that they could use her office, and Investigator Martin and Defendant Koech went into the office alone. Investigator Martin asked Defendant Koech whether he would like the door open or closed. (Exh. 13, AXON_BODY_2_Video_2017-08-02, 00:29-58). After Defendant Koech closed the door to the office, Investigator Martin gave him a copy of the search warrant and the receipt for the seizure of his cell phone. (Id.). Investigator Martin then handed the cell phone to Defendant Koech and said that the password "2174" did not work. (Id. at 1:00-06). Investigator Martin asked Defendant Koech to enter the password and He did—twice—but the phone did not unlock. (Id. at 1:35-2:05). Defendant Koech stated, "It's

2174," and Investigator Martin confirmed that that was the password they had used but that it had not worked. (Id. at 1:30-35). After trying twice more to unlock the cell phone, Defendant Koech unlocked the phone. (Id. at 1:35-2:05). Investigator Martin asked for the correct password, and Defendant Koech said, "7977." (Id. at 2:05-09). Investigator Martin retrieved the cell phone, used the password to unlock it, and stated he would call Defendant Koech later at the phone number he had for Defendant. (Id. at 2:25-:36). Investigator Martin said, "Thank you," and Defendant Koech replied, "You're welcome." (Id.). Investigator Martin then left the nursing home. (Id. at 2:36-3:21). At the May 7, 2018, Motion Hearing, Investigator Martin testified—and the audio-video recording corroborates—that Defendant Koech was polite and "cooperative throughout" the encounter. (Transcript, [Docket No. 71], 9, 14).

Defendant Koech now argues that "by threatening to destroy his phone if he did not give them the password," Investigator Martin compelled him to involuntarily disclose the password to his cell phone on August 2, 2017. (Mem. in Supp., [Docket No. 75], 10, 13). Defendant Koech further contends that the encounters were custodial in nature and that the failure to advise him of his Miranda rights prior to interrogating him requires suppression of any evidence discovered as a result. (Id. at 11). In response, the Government asserts that Defendant Koech's statements during these August 2, 2017, encounters were voluntary and the encounters themselves were non-custodial. (Mem. in Opp., [Docket No. 76], 8, 14).

After a thorough review of all of the evidence of record that relates to the interactions between Defendant Koech and Investigator Martin on August 2, 2017, the Undersigned concludes that Defendant Koech was not in custody during either encounter on August 2, 2017, and because the encounters were not custodial in nature, Miranda warnings were not required. Moreover, the evidence now before the Court does not demonstrate that Defendant Koech's

statements during the August 2, 2017, encounters were the product of his will being overcome by coercive behavior on the part of Investigator Martin.

Although Investigator Martin told Defendant Koech that if he did not provide the password for his cell phone, the phone might be destroyed in an attempt to retrieve the data on it, such a statement is not so independently coercive as to render Defendant Koech's subsequent statement of the password unconstitutionally involuntary. Investigator Martin testified at the May 7, 2018, Motions Hearing that had he not obtained the password, the phone might have been sent for a "chip-off," which is a procedure during which "the phone could be damaged or destroyed while attempting to get the data off of the phone." (Transcript, [Docket No. 71], 9). Thus, his statement to Defendant Koech regarding the potential for destruction of the phone was merely a representation of the steps Investigator Martin would take if he could not obtain the password for the cell phone. Such statements are not coercive to the extent that they render responses by a defendant involuntary. See, U.S. v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002) (noting that "accurate representation[s] of [a defendant's] predicament" are not unduly coercive).

Moreover, Investigator Martin testified that he spoke to Defendant Koech during the initial conversation in a calm tone of voice, similar to the tone he used while testifying before the Undersigned at the May 7, 2018, Motions Hearing. The audio/video recording of the second, recorded encounter reveals the same. Neither encounter lasted more than a few minutes. Investigator Martin testified that he made no threats or promises to Defendant Koech during the first encounter and, again, the audio/video recording of the second, recorded encounter reveals the same. During the second, recorded encounter, Investigator Martin allowed Defendant Koech to decide whether the door to the office they were in would remain open or closed. There is no indication that Defendant Koech's movements were in any way restricted by Investigator Martin

during either encounter on August 2, 2017. He was not arrested at the conclusion of either encounter, and Investigator Martin did not use any "strong arm" or intimidation tactics to elicit the cell phone password. From the totality of the circumstances of the encounters, Defendant Koech voluntarily acquiesced to answer the questions posed by Investigator Martin, and the encounters occurred at Defendant Koech's workplace, with other individuals close by.

Accordingly, Defendant Koech's arguments that his statements made during the August 2, 2017, encounters should be suppressed as involuntary or because he was not advised of his Miranda rights are unavailing. See, Giboney, 863 F.3d at 1029 (holding that statements made during a non-custodial encounter need not be suppressed for the lack of Miranda warnings); Thunderhawk, 799 F.3d at 1206 (holding that coercive police conduct is a necessary prerequisite to finding statements involuntary).

### iii.  The September 11, 2017, Statements

At approximately 3:06 p.m. on September 11, 2017, Investigator Martin and Agent Heidenreich of the FBI walked up to Defendant Koech's home, where he was sitting on the porch. (Govt. Exh. 13, AXON_Body_2_Video_2017-09-11_1006.mp4, 00:00-1:03). Agent Heidenreich stated that they were investigating a possible kidnapping of a minor female with whom Defendant Koech had had contact, and they wanted to talk to him about it. (Id. at 1:03-26). Defendant Koech asked if "she" was kidnapped and, when Agent Heidenreich said that they were trying to figure that out, Defendant Koech responded, "I'll help you with that." (Id. at 1:26-44). Agent Heidenreich asked if Defendant Koech would mind going down to the police substation or if he would rather talk there, and Defendant Koech said he would rather talk "here." (Id. at 1:44-1:58). When Investigator Martin asked if he wanted to go inside to talk, Defendant Koech got up and walked into the building. As they all walked upstairs and Defendant Koech

unlocked his apartment door, he stated: "Yeah, I'll definitely help you with your investigation," and either Agent Heidenreich or Investigator Martin responded that they appreciated it. (Id. at 1:50-2:34). Defendant Koech led the way into his living room and said, "You can sit down." (Id. at 2:34-46). He sat on a couch, Agent Heidenreich sat on a loveseat perpendicular to the couch, and Investigator Martin sat across the living room from the couch. (Id. at 2:46-3:33).

Defendant Koech, Agent Heidenreich, and Investigator Martin spoke about the events underlying this case, with Agent Heidenreich and Investigator Martin questioning Defendant Koech about the details of his interactions with Defendant Mathis and the alleged victims. (Id. at 2:46-50:00). At approximately 36 minutes into the encounter, Agent Heidenreich reiterated how appreciative they were that Defendant Koech had been so cooperative. (Id. at 36:34-36). At that point, Investigator Martin encouraged Defendant Koech to be truthful; Investigator Martin stated that he had seen the contents of Defendant Koech's cell phone and, although he had been cooperative, the evidence on his cell phone did not line up with his statements. Investigator Martin again encouraged Defendant Koech, "if you're willing, of course," to tell the truth, and he further asserted that this was Defendant Koech's chance to tell his story. (Id. at 50:00-53:08).

Defendant Koech continued talking to Investigator Martin and Agent Heidenreich, who continued to challenge his truthfulness on certain details. (Id. at 53:08-1:27:00). At approximately 1 hour and 25 minutes into the encounter, Agent Heidenreich told Defendant Koech that they were "almost at the end of the road," but he would give him one last chance to tell the truth. (Id. at 1:25:40-1:26:37). Agent Heidenreich informed Defendant Koech that he was "not going to jail today." (Id. at 1:29:41-1:29:50). When Defendant Koech continued to deny having sex with the alleged victims, Agent Heidenreich ended the encounter and informed him that the Duluth Police Department was going to execute a search warrant for his home. Agent

Heidenreich repeated that he was not under arrest, patted him down for officer safety, and Investigator Martin, whose body camera recorded the encounter, left the apartment. (1:29:41-1:30:55).

With respect to this encounter, Defendant Koech argues that his statements should be suppressed because Investigator Martin and Agent Heidenreich "cornered him in his apartment and badgered him with questions for over an hour, effectively forcing him to engage in an uncomfortable question and answer session." (Mem. in Supp., [Docket No. 75], 11). The Government responds that under the totality of the circumstances, the encounter was not custodial in nature, and Defendant Koech's statements were voluntary, not coerced. (Mem. in Opp., [Docket No. 76], 11, 13).

Although this encounter presents a closer call than the other encounters challenged herein, the Undersigned concludes that the questioning of Defendant Koech by Investigator Martin and Agent Heidenreich on September 11, 2017, was not custodial in nature and, therefore, did not require Miranda warnings.

As already stated above, determination of whether an individual is "in custody" for Miranda purposes requires an examination of the totality of the circumstances and the resolution of whether, under those circumstances, "'a reasonable person would have felt at liberty to terminate the interrogation and leave or cause the agents to leave.'" See, Laurita, 821 F.3d at 1024. There are six factors that inform this analysis, although they "need not be applied 'ritualistically' in every case." See, Giboney, 863 F.3d at 1027.

First, the following circumstances, if present, would tend to show that Defendant Koech was not in custody:  (1) if he was informed that the questioning was voluntary, that he was free to leave or ask Investigator Martin and Agent Heidenreich to leave, or that he was not under

25

arrest; (2) if he had "unrestrained freedom of movement during questioning"; and (3) if he initiated contact with Investigator Martin and Agent Heidenreich or voluntarily acquiesced to a request for questioning. See, Id. On the other hand, the following circumstances, if present, would tend to show that Defendant Koech was in custody during the interrogation: (1) the use of "strong arm tactics or deceptive stratagems" by Investigator Martin and/or Agent Heidenreich; (2) a police-dominated atmosphere; and (3) placing him under arrest at the end of the questioning. See, Id.

    In the present case, Defendant Koech voluntarily acquiesced to the questioning; he affirmatively stated twice that he would "help" with the investigation. (Govt. Exh. 13, AXON_Body_2_Video_2017-09-11_1006.mp4, 1:26-44, 1:58-2:34). Although he was not explicitly informed that he was free to leave or to ask Agent Heidenreich and Investigator Martin to leave, there was no implication by either Agent Heidenreich or Investigator Martin that Defendant Koech would have to participate if he did not want to. Defendant Koech's willingness to answer questions was acknowledged initially by either Agent Heidenreich or Investigator Martin, who told him how much they appreciated his help. (Id. at 1:58-2:34). Later in the encounter, Agent Heidenreich reiterated their appreciation for his cooperation. (Id. at 36:34-36:36). Similarly, Investigator Martin, when encouraging Defendant Koech to tell the truth, qualified that encouragement by stating: "[I]f you're willing, of course." (Id. at 50:00-53:08). All of these statements support the conclusion that a reasonable person in Defendant Koech's position would have felt free to conclude the interrogation at any time and to leave or to cause Agent Heidenreich and Investigator Martin to leave. In addition, although Defendant Koech did not seek to move about during the questioning, his movement was not restrained in any way.

Moreover, Agent Heidenreich or Investigator Martin did not employ "strong arm tactics or deceptive stratagems." Although both Investigator Martin and Agent Heidenreich expressed their disbelief of Defendant Koech's version of events and, at times, expressed their frustration with his perceived untruthfulness, they did not attempt to threaten or deceive him. They remained seated, with physical distance between Defendant Koech and themselves. The atmosphere of the interrogation was not police-dominated. Agent Heidenreich and Investigator Martin conducted the interrogation at Defendant Koech's home, accommodating his wishes, rather than taking him to the police station. They allowed him to smoke cigarettes and drink beer throughout the questioning. At the end of the interrogation, Defendant Koech was not arrested; in fact, Agent Heidenreich explicitly told Defendant Koech that he was not being arrested. (Id. at 1:29:42-1:30:55).

Under the totality of the circumstances, and with full consideration of the six factors identified by the Eighth Circuit as specifically relevant to the question of custody for Miranda purposes, the Undersigned concludes that Defendant Koech was not in custody during the interrogation on September 11, 2017.

Moreover, the audio/video recording of the encounter does not support a finding that Defendant Koech's statements on September 11, 2017, were involuntary or unconstitutionally coerced. Although, as already noted above, Investigator Martin and Agent Heidenreich both expressed their disbelief of Defendant's statements, a mere expression of disbelief is not sufficient to independently render statements involuntary. See, U.S. v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002) (holding that "an 'expressed disbelief in the statements of a suspect'" does not "necessarily render a confession involuntary"). Under the totality of the circumstances present on September 11, 2017, Agent Heidenreich and Investigator Martin's questioning of

27

Defendant Koech was not so coercive as to overcome his will and critically impair his capacity for self-determination.

Accordingly, Defendant Koech's arguments that his statements made during the September 11, 2017, encounter should be suppressed as involuntary or because he was not advised of his <u>Miranda</u> rights are unavailing.

### iv.  The March 7, 2018, Statements

With respect to the statements made by Defendant on March 7, 2018, Defendant Koech states only that he "submits the 3/7/18 interview for review on the record provided by the recorded interview." (Mem. in Supp., [Docket No. 75], 11). He makes no further argument with respect to this interview, and he does not specifically identify any grounds upon which he challenges this interview. (<u>See</u>, <u>generally</u>, Mem. in Supp., [Docket No. 75]). The Government asserts its belief that Defendant Koech has conceded that the statements he made at the March 7, 2018, interview need not be suppressed. (Mem. in Opp., [Docket No. 76], 14).

In an abundance of caution, the Court has independently and thoroughly reviewed the audio/video recording of the interview. Upon its face, the recording shows a custodial, post-arrest interview of Defendant Koech which begins by Defendant freely, knowingly, and voluntarily waiving his Miranda rights orally and in writing. (<u>See</u>, Govt. Exh. 14, AXON_Body_2_Video_2018-03-07, 00:47-3:41).

Specifically, Agent Heidenreich explained to Defendant Koech at the beginning of the encounter that because he was in custody, he must be informed of his <u>Miranda</u> rights. (<u>Id.</u> at 0047-1:34). Agent Heidenreich showed Defendant Koech a written advice of rights forms and read it aloud to him. (<u>Id.</u> at 1:34-2:15). Agent Heidenreich explained that he was not telling Defendant Koech to talk to him without a lawyer present, but it is his option to do so and in order

for them to talk, he would need to sign the advice of rights form and waive his rights. (<u>Id.</u> at 2:05-43). When Defendant Koech asked Agent Heidenreich what it meant that he had been charged, Agent Heidenreich again explained:

> We can't have a conversation until you sign a consent saying that you're willing to waive your <u>Miranda</u> rights, okay? Now, like the form says, [reading the form] "If you decide to answer now without a lawyer present, you have the right to stop answering at any time." So basically what that means is if you sign this you're willing to talk to us. It doesn't mean that you can't stop talking to us at any time. It doesn't mean that you have to answer our questions. But until you sign the form, we can't have a conversation.

(<u>Id.</u> at 2:52-3:32). Defendant Koech said, "Okay," and Agent Heidenreich stated, "So if you're willing to waive your rights and talk, then I'm going to have you sign [the form]." (<u>Id.</u> at 3:32-38). He returned the form to Defendant, who signed it. (<u>Id.</u> at 3:38-41).

The interview lasted less than 45 minutes and at no time prior to the end of the interview did Defendant Koech indicate that the interview was continuing against his wishes or that he wished to speak to a lawyer before answering any additional questions. (<u>See</u>, <u>generally</u>, Govt. Exh. 14, AXON_Body_2_Video_2018-03-07). Neither Agent Heidenreich nor Investigator Martin, who was also present, engaged in behavior that rendered any of Defendant Koech's statements involuntary. And again, Defendant Koech has made no specific challenges to the constitutionality of his statements on March 7, 2018. In the absence of such specific challenges and in light of the totality of the circumstances surrounding Defendant Koech's statements to law enforcement on March 7, 2018, the Undersigned sees no justification for suppression of the statements made by Defendant at that time.

29

### C. Conclusion

For all of the reasons stated above, and upon a thorough independent review of all of the evidence submitted to the Court, the Undersigned recommends that Defendant Koech's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 50], be **DENIED**.

## III.    DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE, [Docket No. 51]

Defendant Koech argues that each of the four search warrants he now challenges was not supported by the requisite probable cause showing that evidence of a crime might be found in the place or device identified therein. (Mem. in Supp., [Docket No. 75], 2). He also contends that the warrants issued in this case are overly broad and, therefore, are unconstitutionally generalized. (Id. at 2-9). Finally, he argues that the good-faith exception to the warrant requirement does not save the searches conducted in the present case pursuant to the allegedly unconstitutional warrants. (Id. at 9-10). The Government disagrees, arguing that the search warrants were sufficiently supported by probable cause, each warrant demonstrated a sufficient nexus between evidence of crimes and the device or place identified in the warrant, and the warrants are not overly broad. (Mem. in Opp., [Docket No. 76], 1-7).

### A. Standards of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV.

> "[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched." . . . [W]hether the expectation is reasonable is a question of law.

(Internal citations omitted.) <u>United States v. Maxwell</u>, 778 F.3d 719, 732 (8th Cir. 2015).

The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." <u>United States v. Mutschelknaus</u>, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" <u>United States v. Colbert</u>, 605 F.3d 573, 576 (8th Cir. 2010) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." <u>United States v. Hager</u>, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted). In addition, "[t]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." <u>United States v. Tellez</u>, 217 F.3d 547, 550 (8th Cir. 2000).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." <u>United States v. Grant</u>, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" <u>United States v. Smith</u>, 581 F.3d 692, 694 (8th Cir. 2009) (quoting <u>United States v. Reivich</u>, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" <u>United States v. Wiley</u>, No. 09-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting <u>United States v. Solomon</u>, 432 F.3d 824, 827 (8th Cir. 2005) (edits in <u>Wiley</u>).

31

In addition, the issuing court's "'determination of probable cause should be paid great deference by reviewing courts,'" Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the issuing court] had a 'substantial basis for . . . [concluding]' that probable cause existed." Id. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

**B. Analysis**

**i. The July 15, 2017, Search Warrant, Govt. Exh. 9, [Docket No. 62-9]**

On July 15, 2017, Lieutenant Shene of the Duluth Police Department applied for and obtained a search warrant to search Defendant Koech's person and his home for Defendant's DNA and for "[o]ne black Android Cell phone with [c]racked screen and silver back." (Govt. Exh. 9, [Docket No. 62-9], 1-6). The application for the July 15, 2017, search warrant stated the following facts as the grounds for issuing the search warrant:

1. Juvenile female CLD [birth date] was listed as a runaway from Solway House, 2405 W. 5th St., Duluth, MN on 6/17/2017.

2. CLD was located in a closet at [address] on the evening of 07/07/2017.

3. That apartment is rented by Andreia Latrice BROWN [birthdate].

4. Andre MATHIS [birthdate] was also in Apartment [redacted] with BROWN and CLD.

5. CLD was removed from the apartment and interviewed at the Duluth Police Department.

6. CLD told police the following information:
   a. She met MATHIS the same day she ran from the Solway House.
   b. She has been trafficked by MATHIS a total of four times with one client name [sic] Amos.
   c. The agreed upon price was $150 for penile/vaginal intercourse.
   d. On two of those occasions, client Amos only had $100 and that was accepted.
   e. CLD was given a code word to use if client Amos wanted anything else so the price could be adjusted.

  f. MATHIS was in the living room of Amos' residence each time to be able to hear the code word if needed.

  g. MATHIS uses cell phones to arrange clients for CLD, including voice calls and text messages.

  h. Client Amos took pictures of CLD using his cell phone.

7. Both Amos Kiprop Koech [birthdate] and his residence match the descriptions given by CLD.

8. Police located KOECH outside his apartment on the morning of 07/15/2017.

9. Koech agreed to talk with police and provided the following information:

  a. KOECH is familiar with MATHIS and has known him for about two years.

  b. KOECH showed police text messages on his phone between he and MATHIS.

  c. MATHIS has been over to KOECH's apartment in the past.

  d. MATHIS brought two females over to KOECH's apartment about a month ago.

  e. KOECH stated he was told the girls were 18 and 19 years of age.

  f. KOECH explained that when a girl tells him their age, he automatically subtracts two years.

  g. KOECH's cell phone has a cracked screen.

  h. KOECH told police his phone does not have a camera on it.

  j. [*sic*] When police were given KOECH's phone to see the text messages between KOECH and MATHIS, police observed what appeared to be a camera on the phone.

(Id. at 1-3).

  Defendant Koech contends that the warrant application "fails to state in any meaningful way what evidence was thought to be contained in his DNA or cell phone, nor does the application otherwise make a meaningful evidentiary connection between the searched items and any crime." (Mem. in Supp., [Docket No. 75], 3).

  The Undersigned disagrees. It is well understood that a court issuing a search warrant may draw reasonable inferences from the totality of the circumstances in making its probable cause determination. See Technical Ordnance, Inc. v. United States, 244 F.3d 641, 647 (8th Cir. 2001). The information related in the July 15, 2017, affidavit submitted in support of the application for the search warrant clearly sets forth that a juvenile female, CLD, informed Duluth

33

Police that Defendant Mathis had trafficked her to an individual named Amos four times, exchanging sexual intercourse for money. The trafficking was arranged by cell phone, both voice calls and text messages. CLD further informed police that the individual named Amos took pictures of her using his cell phone. Defendant Koech's first name is Amos. He admitted knowing Defendant Mathis and he further admitted to police that Defendant Mathis had brought two females to his apartment approximately one month earlier. Defendant Koech also showed police text messages between Defendant Mathis and himself on his cell phone. Defendant Koech informed police that his cell phone did not have a camera, but police observed what appeared to be a camera on the cell phone.

Under the totality of the circumstances presented here, the affidavit submitted in support of the application for the July 15, 2017, search warrant contained sufficient information to support a finding of probable cause to issue the search warrant. Based upon the facts related to the issuing court, it was reasonable to assume that Defendant Koech was the "Amos" of whom CLD spoke, that there could be evidence of the trafficking of CLD on his cell phone, which cell phone officers had previously seen on his person at his home—either through text messages between Defendant Koech and Defendant Mathis or by pictures on Defendant Koech's cell phone—and that Defendant Koech's DNA could provide evidence of his sexual contact with CLD. The affidavit submitted in support of the application for the July 15, 2017, search warrant articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime; thus, there was probable cause to issue the warrant to search Defendant Koech's home and person to seize his cell phone and DNA.

Accordingly, to the extent that Defendant seeks to suppress the items seized pursuant to the July 15, 2017, search warrant described above, the Undersigned recommends that

Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 51], be denied.

### ii. The July 31, 2017, Search Warrant, Govt. Exh. 10, [Docket No. 62-10]

On July 31, 2017, Investigator Martin applied for a search warrant to search a "Black android cell phone with cracked screen currently in evidence at Duluth Police Headquarters"— Defendant Koech's cell phone, which was seized on July 15, 2017. (Govt.'s Exhibit 10, [Docket No. 62-10]). In support of the application for the July 31, 2017, search warrant, Investigator Martin provided an affidavit that related the following facts, in addition to Investigator Martin's law enforcement credentials and experience:

On July 7, 2017, Duluth Police Officers were asked to assist Probation Officer Gibbons with a check of a GPS unit of a client on probation, Andreia Latrice Brown. ([Docket No. 62-10], 2). After gaining consent to enter Brown's apartment, officers discovered a "missing person/runaway" identified as CLD. Defendant Mathis was also present at Brown's apartment. (Id.).

Officer Pemrick thereafter interviewed CLD at Duluth Police Headquarters, and CLD stated that she had been trafficked for sex by Defendant Mathis. (Id.). CLD further told Officer Pemrick that Defendant Mathis had used his phone to arrange for her to have sex with clients, and that she had sex with a man named Amos on four occasions in exchange for money. (Id.). CLD also stated that "Amos" had taken photos of her with his phone. CLD stated that Defendant Mathis gave her a code word to say if the client attempted anything other than the acts agreed to by Defendant Mathis. (Id.). CLD stated that she received no money from the intercourse, but that Defendant Mathis bought her things. (Id.). CLD described "Amos'" apartment as "over by the wash bucket at the second floor of a duplex where she could see a park out the back window."

(Id.). Investigator Martin's affidavit continued:  "Officer Pemrick suspected that 'Amos' was [Defendant Koech], based off the description of the apartment and his knowledge of the Lincoln Park Patrol district in which he works." (Id.).

> Investigator Martin's affidavit further set forth:
>
> On 7/15/2017 Officer Pemrick made contact with [Defendant Koech] on [his] front porch. [Defendant Koech] admitted to knowing Mathis, and that Mathis had been over to his apartment a lot of times. [Defendant Koech] stated that Mathis had brought girls over in the past, the last time being around 1 month ago. [Defendant Koech] stated that last time Mathis was over with girls around over [*sic*] a month ago, they were 2 white females who stated they were 19 and 18 years old. [Defendant Koech] denied having sex with the girls that came over. [Defendant Koech] stated that he did have contact with Mathis over the phone, and showed Officer Pemrick text messages from [number redacted], which he stated was Mathis' number. [Defendant Koech] stated that [the] last text message he received from Mathis was on July 9, 2017.
>
> Officer Pemrick noted in his report that when he was speaking with [Defendant Koech] he noticed [Defendant Koech's] cell phone had a camera lens on it. Officer Pemrick asked [Defendant Koech] if he could view the phone again, and [Defendant Koech] denied Officer Pemrick stating it would be a violation of his privacy and he would need a lawyer for that. Officer Pemrick ended the interview and left the apartment. Office Pemrick consulted with Lt. Shene, who advised him to return to the apartment pending a search warrant. Once a search warrant was granted, Officer Pemrick collected a black cracked screen android cell phone and a buccal swab was collected from [Defendant Koech].
>
> Your affiant asks the court to grant a search warrant to do a full forensic examination of [Defendant Koech's] cell phone for evidence of sex trafficking. CLD reported that Mathis arranged clients over the phone, who she would go have sex with. CLD reported having sex with a male named "Amos" on 4 separate occasions. [Defendant Koech] admitted to knowing and having phone contact with Mathis. [Defendant Koech] also admitted that Mathis had brought females over to his apartment in the past, which were white females who stated they were 18 and 19 years old. CLD was listed as a runaway/missing person on 6/17/2017 along with MLF [birthdate redacted], another white female.

(Id. at 2-3). On July 31, 2017, a Minnesota State District Court Judge signed and issued the requested search warrant. (Id.at 5-6).

Defendant Koech first argues that the affidavit submitted in support of the application for the July 31, 2017, search warrant failed to set forth sufficient facts stating why the search of his cell phone was likely to lead to the discovery of the evidence of a crime. (Mem. in Supp., [Docket No. 75], 3-4). A review of the affidavit submitted in support of the application for the July 31, 2017, search warrant shows otherwise.

As set forth above, the affidavit submitted in support of the application for the July 31, 2017, search warrant clearly sets forth that CLD informed Officer Pemrick that she had been trafficked by Defendant Mathis, who sold sex with her for money, including to an individual with Defendant Koech's first name. CLD described the individual's apartment, which Officer Pemrick believed to be Defendant Koech's apartment, based upon his knowledge of the area as his patrol district. CLD also told Officer Pemrick that "Amos" had taken photos of her with his phone. When Officer Pemrick spoke with Defendant Koech, Defendant admitted knowing Defendant Mathis, and he admitted that Defendant Mathis had brought two white females, who stated they were 18 and 19 years old, to his apartment approximately 1 month earlier. Moreover, Defendant Koech admitted that he and Defendant Mathis communicated by phone, and he showed Officer Pemrick text messages from a number he identified as belonging to Defendant Mathis. Finally, although Defendant Koech denied that his cell phone had a camera and declined to allow Officer Pemrick to examine his cell phone to determine whether it had a camera, Officer Pemrick noticed a camera lens on Defendant Koech's cell phone.

As already noted above, probable cause is a fluid concept that focuses on factual and practical considerations of everyday life upon which reasonable, prudent men, and not legal technicians, rely to act. Colbert, 605 F.3d at 576. Courts use a totality of the circumstances test to determine probable cause. Hager, 710 F.3d at 836.[9] The duty of this reviewing Court is simply to ensure that the issuing court had a substantial basis for concluding probable cause existed, Gates, 462 U.S. at 238-39, and not to conduct a de novo determination of probable cause. Massachusetts v. Upton, 466 U.S. 727, 728 (1984). When viewed in light of the totality of the circumstances and drawing reasonable factual inferences in the present context of this case, the affidavit submitted in support of the July 31, 2017, search warrant application provides sufficient facts to support a finding of probable cause by the issuing judge.

Defendant Koech also argues that the search warrant was overbroad in the sense that it was not sufficiently particular, and that it allowed "a generalized unlimited search of the contents of the cell phone without describing what evidence was being sought by the search of the phone." (Mem. in Supp., [Docket No. 75], 4). Stated another way, Defendant Koech contends that "the cell phone warrants are overly broad in their unlimited request for a full forensic examination" without limiting the areas of the phone to be searched. (Id. at 5-7).

In support of this argument, Defendant Koech analogizes the current case to United States v. Winn, 79 F. Supp. 3d 904 (S.D. Ill. 2015). (Id. at 8-9).

In Winn, as part of an investigation into a report that a man had used his cell phone to photograph or videotape underage girls without their permission at a public pool, Nathaniel Winn consented to police seizure of his cell phone. 79 F. Supp. 3d at 909-10. An officer later applied for a warrant to search the cell phone for

---

[9] It is also well understood that the issuing court may draw reasonable inferences from the totality of the circumstances in making their probable cause determination. See Technical Ordnance, Inc. v. United States, 244 F.3d 641, 647 (8th Cir. 2001).

> any or all files contained on said cell phone and its SIM Card or SD Card to include but not limited to the calendar, phonebook, contacts, SMS messages, MMS messages, emails, pictures, videos, images, ringtones, audio files, all call logs, installed application data, GPS information, WIFI information, internet history and usage, any system files on phone, SIM Card, or SD Card, or any data contained in the cell phone, SIM Card or SD Card to include deleted space.

Id. at 911.

A state court Circuit Judge signed the search warrant, and the search of the cell phone revealed pornographic images of children. Id. After Winn was indicted for receipt of visual depictions of minors engaged in sexually explicit conduct, he moved to suppress the evidence obtained from his cell phone for multiple reasons, including that the search warrant was overbroad and lacked sufficient particularity. Id. at 912. Winn argued that the broad scope of the search warrant "essentially invited the police to conduct an illegal general search of his cell phone." Id. On appeal, the United States District Court for the Southern District of Illinois agreed.

Noting that the Seventh Circuit had instructed police officers to narrowly tailor warrants, the Winn court held that "[w]ith regard to the objects of the search, . . . the warrant was facially overbroad, exceeded the probable cause to support it, and was not as particular as the circumstances would allow" because "the police did not have probable cause to believe that *everything* on the phone was evidence of the crime" being investigated. Id. at 919. The court noted that the affidavit contained no basis to believe that data other than photos and videos could possibly be evidence of the crime; therefore, the court concluded, that "the warrant was overbroad, because it allowed the police to search for and seize broad swaths of data without probable cause to believe it constituted evidence of [the crime identified in the warrant application]." Id. at 920.

Here, Defendant Koech urges this Court to adopt the reasoning in <u>Winn</u>. (Mem. in Supp., [Docket No. 75], 8-9). He asserts that the warrant issued on July 31, 2017, in the present case "permit[s] a general exploratory search (a complete forensic examination) to rummage through the defendant's phone without limitation and without specifying or limiting the search to evidence of crime." (<u>Id.</u>). The Undersigned disagrees.

To the extent that Defendant Koech intends to raise a particularity argument about the July 31, 2017, warrant itself, the Fourth Amendment requires warrants to "particularly describ[e] the place to be searched, and the person or things to be seized."

> Particularity prohibits the government from conducting "general, exploratory rummaging of a person's belongings." "To satisfy the particularity requirement of the fourth amendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." Furthermore, "[t]he degree of specificity required will depend on the circumstances of the case and on the type of items involved." This particularity standard is one of "practical accuracy rather than" of hypertechnicality.

<u>United States v. Sigillito</u>, 759 F.3d 913, 923 (8th Cir. 2014).

The July 31, 2017, search warrant now at issue authorized the search of "[o]ne black android cell phone with cracked screen [] currently in evidence at Duluth Police Headquarters." (Govt. Exh. 10, [Docket No. 62-10], 5-6). Investigator Martin's affidavit submitted in support of the application for the July 31, 2017, search warrant stated that CLD had informed police that pictures had been taken of her using a phone and that Mathis arranged her trafficking through the use of text messages. Although the best practice is to specifically identify the applications and data for which the search of a cell phone is sought, under the totality of the circumstances of this case, and "depend[ing] on the circumstances of the case and on the type of items involved," <u>see</u>, <u>Sigillito</u>, 759 F.3d at 923, the July 31, 2017, search warrant in this case was not overbroad nor did it lack in particularity.

Accordingly, to the extent that Defendant Koech seeks to suppress information or items seized pursuant to the July 31, 2017, search warrant of his cell phone, as described above, the Undersigned recommends that Defendant Koech's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 51], be denied.

### iii. The August 8, 2017, Search Warrant, Govt. Exh. 11, [Docket No. 62-11]

Defendant Koech next challenges the search warrant applied for and issued on August 8, 2017. (Mem. in Supp., [Docket No. 75], 4). With respect to this search warrant in particular, he states only:

> Counsel is not certain that there was any evidence relevant to the case discovered on the phone, or that it has anything to do with Mr. Koech. Nonetheless, in an abundance of caution, we challenge it for lack of probable cause and overbreadth, along with the other warrants that have been submitted for four corners review.

(Id.). The Government responds that the August 8, 2017, search warrant "relates to . . . a phone seized from Andreia Latrica [*sic*] Brown's apartment on July 7, 2017, and does not relate to [Defendant] Koech." (Mem. in Opp., [Docket No. 76], 2 n.1). Review of the August 8, 2017, search warrant and the affidavit submitted in support of the application therefor shows that this search warrant concerned a "white motorola cell phone." (Govt. Exh. 11, [Docket No. 62-11], 1, 4, 6-8).

> "[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched." . . . [W]hether the expectation is reasonable is a question of law.

(Internal citations omitted.) Maxwell, 778 F.3d at 732. Therefore, in order to challenge the warrant issued on August 8, 2017, for the white Motorola cell phone, Defendant Koech must

'present evidence of his standing, or at least . . . point to specific evidence in the record which the government presented [that] established his standing.'" See, Id. (citation omitted).

Defendant Koech has not done so with respect to the August 8, 2017, search warrant. To the contrary, he candidly admits that he is not certain that the white Motorola cell phone "has anything to do with" him. (Mem. in Supp., [Docket No. 75], 4). As Defendant Koech has not shown any evidence that he had any expectation of privacy in the white Motorola cell phone that was the subject of the August 8, 2017, search warrant, he has no standing to challenge the search thereof.

Accordingly, to the extent that he seeks to suppress information or items seized pursuant to the August 8, 2017, search warrant of a white Motorola cell phone, the Undersigned recommends that Defendant Koech's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 51], be denied.

### iv. The September 7, 2017, Search Warrant, Govt. Exh. 12, [Docket No. 62-12]

Finally, Defendant Koech challenges the search warrant issued on September 7, 2017, that authorized the search of his apartment. (Mem. in Supp., [Docket No. 75], 4). He argues that the warrant is not supported by sufficient probable cause and that it is overbroad, as it "fails to contain any limits on the search." (Id.). The Government disagrees on both points. (Mem. in Opp., [Docket No. 76], 4-6).

The application for the September 7, 2017, search warrant was supported by an affidavit from Investigator Martin. (See, Govt. Exh. 12, [Docket No. 62-12], 1-6). The affidavit included the information already set forth above as submitted in support of the application for the July 31, 2017, search warrant of Defendant's cell phone. (Id. at 1-4). In addition, Investigator Martin's

September 7, 2017, affidavit stated that, pursuant to the July 31, 2017, search warrant,

Investigator Martin had begun to process Defendant's cell phone on August 31, 2017. (Id. at 4).

> Located on the phone in the images portion were multiple photographs which appeared to be of a white juvenile female topless that was consistent with [name redacted's] profile. These images do qualify as child pornography. Your affiant reviewed the photos and body camera footage from ICR 17157361.

> On 09/06/2017 your affiant, Investigator Braun, and Trafficking Outreach advocate Makoons Miller Tanner went to Abbot Northwestern Hospital to interview CLD. CLD was shown 4 redacted photos from the images located on Koech's cell phone. CLD confirmed the photos were of her, that they were taken in Koech's bedroom, and that she was putting her clothes back on at the time. CLD also stated Koech was aware of her age prior to having sex with her.

> On 09/07/2017 while further examining the contents of Koech's phone, your affiant noted that Koech has [sic] conversations with females about paying for sex. Your affiant also noted conversations on facebook messenger on Koech's phone asking females to come over and hang out, one of them is named [E.R. – name redacted]. Your affiant noted the facebook profile under that name notes [E.R.] goes to Superior High School and worked at "babysitting.["]

> In past cases I have consulted with Lake Superior Forensic Technology and ICAC Task Force Investigator Jeanine Pauly who is a trained computer and cellular phone forensic examiner. She told me that data on social media sites can be accessed by cellular phones, and various types of computers. It is common for suspects who target children to contact other individuals on how to meet their victims. They will communicate with others via email and social media sites on their computers or through their cellular phone[s]. This data can often be retrieved using Forensic software tools from these types of devices even if deleted. Information from Facebook, Facebook Messenger and other social media sites can be stored in various locations on a cellular phone or a computer. The information is often found in the internet history, databases, programs, images and videos, audio files, messages in various forms such as MMS or chat, and can also contain GPS location information when using the application.

(Id. at 4). Based upon this information, on September 7, 2017, Investigator Martin requested a

warrant to search Defendant Koech's home for:

> 1. Digital devices and storage media to include cellular phones, smart phones, tablet computers, computers and computer systems, peripheral devices to include: hard drives, keyboards, monitors, smart televisions, cords, wires, cables, software and manuals, for the normal operations of electronic devices. Computer and cellular phone storage media to include, diskettes, CD's, DVD's[,] other optical

43

media, zip disks, flash drives, memory sticks, memory cards, and any other data storage devices or systems.

2. Permission to conduct an in-depth forensic examination of all digital devices and storage media seized during the execution of this warrant to search for evidence relating to the solicitation of a minor, evidence related to sex crimes and child pornography. The examination will include a review of all data including deleted data contained on the digital evidence [*sic*] including but not limited to images, videos, documents, cellular phone data, messages, call logs, emails both read and unread, internet data files and search histories, other communications, as well as any other data connecting a specific user to the evidence and items seized. The forensic examination will be conducted by a trained computer and cellular phone examiner of the affiant's choice and location.

3. Indicia of Occupancy[.]

4. Photos of interior and exterior of residence.

5. Notes or writings which could include sign in names and/or passwords for access to computers, cellular phones, websites, file systems or other password protected files or systems.

(Id. at 1). On September 7, 2017, a Minnesota State District Court Judge issued the warrant as requested. (Id. at 7-9).

Defendant Koech argues generally that "the warrant lacks meaningful information connecting the total sweep through [his] apartment with evidence of crime, and fails to contain any limits on the search, and is thus overbroad." (Mem. in Supp., [Docket No. 75], 4). The Undersigned disagrees.

Investigator Martin's September 7, 2017, affidavit clearly sets forth probable cause sufficient to justify the issuing judge's authorization of the search of Defendant Koech's apartment sought therein. The affidavit submitted in support of the September 7, 2017, search warrant set forth particular facts, including evidence gathered as a result of prior searches of Defendant Koech's cell phone. In addition to the facts already repeatedly discussed within this Report and Recommendation as establishing probable cause that evidence of a crime existed on

Defendant Koech's cell phone, the September 7, 2017, affidavit stated that CLD had identified pictures on Defendant Koech's phone as being of her and as being taken while she was partially undressed after having sex with Defendant Koech. Moreover, Investigator Martin stated in his September 7, 2017, affidavit submitted in support of the application for a search warrant that his prior experience and that of the well-qualified Investigator Pauly was that additional evidence of sexual crimes against minors is often found in the electronic devices of individuals who target children. When viewed through the lens of common sense, the affidavit submitted in support of the September 7, 2017, application for a search warrant provides a substantial basis for the issuing judge to conclude that probable cause existed to believe that evidence of a crime would be found in Defendant's apartment and on the electronic devices identified therein.

Finally, to the extent that Defendant argues that the September 7, 2017, search warrant was unconstitutionally broad in that it failed to place reasonable limits on the search conducted pursuant to its authority, the Undersigned again disagrees. On its face, the September 7, 2017, search warrant is not limitless and, in fact, it does not authorize a limitless search of Defendant's apartment, contrary to Defendant's argument. (See, Mem. in Supp., [Docket No. 74], 9).

Accordingly, to the extent that Defendant seeks to suppress information or items seized pursuant to the September 7, 2017, search warrant of Koech's apartment, the Undersigned recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 51], be denied.

### C.  Conclusion

For all of the reasons stated above, and upon a thorough independent review of all of the evidence submitted to the Court, the Undersigned recommends that Defendant Koech's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 51], be **DENIED**.

45

## IV.      DEFENDANT'S MOTION FOR SEVERANCE, [Docket No. 52]

Defendant Koech moves to sever his case from that of his co-defendant, Andre Mathis, Jr., pursuant to Federal Rules of Criminal Procedure 8 and 14. (Mem. in Supp., [Docket No. 75], 14). Specifically, Defendant Koech argues that he will be significantly prejudiced by a joint trial because evidence will be introduced against Defendant Mathis which would not be admissible against him but will nevertheless prejudice the jury against him. (Id. at 14-15). Defendant Koech also contends that the charges against him are misjoined with Count 2 of the indictment, which is a charge against Defendant Mathis individually. (Id. at 15). In reply, the Government contends that the defendants are properly joined and that a joint trial in this case serves the interests of justice. (Mem. in Opp., [Docket No. 76], 16).

### A.  Standards of Review

Federal Rule of Criminal Procedure 8(b) provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Federal Rule of Criminal Procedure 14(a) provides:  "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

> "There is a preference in the federal system for joint trials of defendants who are indicted together." "This preference is 'especially compelling when the defendants are charged as coconspirators.'" "It is well settled in this circuit that a motion for relief from an allegedly prejudicial joinder of charges or defendants raises a question that is addressed to the judicial discretion of the trial court . . . ."

United States v. Benton, 890 F.3d 697, 713-14 (8th Cir. 2018).

46

"Accordingly, if joinder is proper under Rule 8, a defendant seeking severance 'has the heavy burden of demonstrating that a joint trial will impermissibly infringe his right to a fair trial." United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996). "[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Zafiro v. United States, 506 U.S. 534, 540 (1993) (citations omitted). . . .

A defendant seeking to sever his trial must therefore show that a joint trial would case "real prejudice." United States v. Mickelson, 378 F.3d 810, 817-18 (8th Cir. 2004). "Real prejudice" exists when "(a) [a defendant's] defense is irreconcilable with that of his co-defendant or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants.

United States v. McConnell, No. 13-cr-273 (SRN/FLN), 2017 WL 111304, *3 (D. Minn. Jan. 11, 2017).

### B. Analysis

As stated above, Defendant Koech argues first that joinder is not proper in this case because there is no evidence or allegation that he was involved in the conduct underlying Count 2 of the Indictment, which charges his Co-Defendant Mathis only with sex trafficking by force, fraud, and coercion. (Mem. in Supp., [Docket No. 75], 15). The Government does not specifically respond to this argument by Defendant Koech, other than to generally note that the jury will be separately instructed as to each count and the elements of each and limiting jury instructions are available to address any concern that the jury would consider evidence related to Count 2 when reaching a verdict on other charges against Defendant Koech. (Mem. in Opp., [Docket No. 76], 16-18).

As stated above, Federal Rule of Criminal Procedure 8(b) provides that defendants are properly joined "if they are alleged to have participated . . . in the same series of acts or transactions, constituting an offense or offenses." More specifically:

"Generally, the 'same series of acts or transactions' means acts or transactions that are pursuant to a common plan or a common scheme." United States v. Wadena, 152 F.3d 831, 848 (9th Cir. 1998). "[I]t is a well settled rule in [the

Eighth C]ircuit that the propriety of joinder must appear on the face of the indictment." <u>United States v. Bledsoe</u>, 674 F.2d 647, 655 (8th Cir. 1982). "Rule 8(b) requires that there be some common activity involving all of the defendants which embraces all the charged offenses even though every defendant need not have participated in or be charged with each offense." <u>Id.</u> at 656. Courts must liberally construe Rule 8(b). <u>Id.</u> at 655.

<u>U.S. v. McArthur</u>, No. 12-cr-26 (JRT/JSM), 2013 WL 101925, *2 (D. Minn. Jan. 8, 2013).

Defendant Koech's argument is unpersuasive. Although only Defendant Mathis was charged with sex trafficking by force, fraud, and coercion in Count 2, both Defendants are charged in Count 1 with conspiracy to commit sex trafficking of that same minor. (Redacted Indictment, [Docket No. 19]). Count 2, as well as the remaining Counts charged in the Indictment—Defendant Koech and Defendant Mathis are each charged with one count of sex trafficking of this same minor—involve acts that were allegedly committed in furtherance of or in conjunction with the conspiracy to commit sex trafficking of the same minor. Therefore, because all of the accused criminal conduct of <u>both</u> Defendants stems from acts which were allegedly taken pursuant to the common scheme of sex trafficking the minor in question, all of the accused criminal conduct stems from "the same series of acts or transactions." As such, the count brought solely against Defendant Mathis is properly joined with the remaining counts charged herein, including the counts brought solely against Defendant Koech, and the requirements of Rule 8(b) are met in this case.

Defendant Koech also argues that he will be significantly prejudiced by a joint trial with his co-defendant because of the anticipated admission of evidence, not otherwise admissible against Defendant Koech, that Defendant Mathis was abusive to other women. (Mem. in Supp., [Docket No. 75], 14). Defendant Koech contends that he will be unfairly prejudiced by this and other evidence against Defendant Mathis and, thus, under Rule 14, his trial should be severed from the trial of Defendant Mathis. (<u>Id.</u>). In response, the Government argues that the present

case does not involve the type of circumstances under which severance pursuant to Rule 14 is warranted. (Mem. in Opp., [Docket No. 76], 16-18). Moreover, the Government asserts that limiting jury instructions could address Defendant Koech's concern that evidence against Defendant Mathis would be improperly considered with respect to the charges brought only against Defendant Koech. (Id. at 18).

The Eighth Circuit has instructed that a District Court "must" sever trials "'[w]here a defendant demonstrates that a joint trial will prejudice [his] right to a fair trial'" and it "may sever trials if it appears that compelling or severe prejudice will [otherwise] result to the defendant." See, U.S. v. Young, 753 F.3d 757, 777 (8th Cir. 2014) (citations omitted and emphasis added). "Defendants may show real prejudice to their right to a fair trial by demonstrating that their defense is irreconcilable with a codefendant's defense, or the jury will be unable to properly compartmentalize the evidence as it relates to the separate defendants." Id. (citations omitted).

In the present case, Defendant Koech does not argue that his defense is irreconcilable with Defendant Mathis' defense. Rather, he solely relies upon his prejudice argument. To the extent that it is warranted by subsequent events in this prosecution, the jury may be given limiting instructions at the appropriate time to ensure that evidence against Defendant Mathis in support of Count 2 is not improperly considered when deciding the charges against Defendant Koech. In addition, "'[s]everance is a remedy that can be provided at the time of trial if appropriate under the circumstances.'" See, U.S. v. Rios-Quintero, No. 16-cv-161(1) (MJD/LIB), 2016 WL 6134545, *13 (D. Minn. Sept. 9, 2016) (quoting U.S. v. Billups, 442 F. Supp. 2d 697, 706 (D. Minn. 2006)). Upon the current record, which contains no more than mere speculation by Defendant Koech as to evidence he anticipates the Government will attempt to introduce at

trial, it is not apparent that a jury would be unable to appropriately compartmentalize the evidence before it, especially with the assistance of limiting jury instructions. If circumstances change in the future, Defendant Koech is free to renew his motion to sever at that time. See, Billups, 442 F. Supp. 2d at 706.

Accordingly, the undersigned recommends that Defendant's Motion to Sever, [Docket No. 52], be **DENIED without prejudice.**

## III.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 50], be **DENIED**;

2. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 51], be **DENIED**; and

3. Defendant's Motion for Severance, [Docket No. 52], be **DENIED without prejudice**.

Dated: July 17, 2018                                          s/Leo I. Brisbois
                                                                     The Honorable Leo I. Brisbois
                                                                     United States Magistrate Judge

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served

with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.